Filed 8/26/25  P. v. Moran CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>ARMANDO IGNACIO MORAN,<br><br>    Defendant and Appellant. | A167158<br><br>(Alameda County<br> Super. Ct. No. 22CR000942) |

Armando Ignacio Moran appeals from convictions of attempted murder, assault and evading a police officer.  Midway through trial, he pleaded no contest to the charges in exchange for the court's promise to sentence him to a term of 23 years 8 months.  He contends the sentence was unauthorized in that the court imposed full terms on enhancements in violation of a statutory directive to impose one-third terms.  He maintains he is entitled to a new sentencing hearing at which the trial court must consider mitigating circumstances under Penal Code[1] sections 1385 and 1170 and impose a determinate sentence not exceeding 23 years 8 months.  We conclude the appeal must be dismissed due to Moran's failure to obtain a certificate of probable cause.

_____

[1]  Further statutory references will be to the Penal Code except as otherwise specified.

1

# BACKGROUND

## I.

### *Factual Background²*

On October 4, 2021, around 9:00 p.m., Alexander Hernandez was at Ryan's Pub in San Leandro with his friends Matthew Ortega, Michael Coelho and Daniel Humburg. A woman they did not know began "verbally disrespecting" them and Hernandez told her she needed to calm down. She said she was going to have "Speedy" come and "take care of" them. Later, the four friends left the pub and walked toward a 7-Eleven, then turned left onto another street. The next thing Hernandez remembered was coming home from the hospital later the same day. He had severe back and neck pain for the next two weeks, as well as migraines, and was taking at least 10 ibuprofen daily.

Humburg remembered leaving the pub but after getting to the corner, the next thing he recalled was being in the street with paramedics cutting his shirt off. He lost consciousness again and woke up in the hospital. He was discharged on October 8 with a neck brace that he had to wear until around December 21, when he was allowed to return to work. He had "pretty intense" pain for about a month, then "more of a soreness."

Coelho remembered there being "a little confrontation" at the pub that he did not focus on and remembered walking to a friend's house later, then the next thing he remembered was waking up in the hospital. He had pain in his arms and legs and the side of his stomach, and a lot of head pain. He stayed in the hospital overnight and had significant pain for at least a month and a half. He took about a month and a half off from his job as a paver and landscaper because it hurt "just to perform basic tasks."

---

² The facts are taken from the preliminary hearing transcript.

At around 4:00 p.m. on October 4, 2021, Officer Joseph Bacon was dispatched to a disturbance in San Leandro in which a blue Chevy Tahoe or GMC Yukon[3] was following a female. At the scene, he saw a blue Tahoe driving toward a parking lot and a female walking southbound on the east curb line. As he and his partner went to make contact, the blue vehicle fled; as it did so, the driver looked directly at the officers, said " 'fuck the police' " and gave Bacon the middle finger. Bacon identified Moran as the driver. Another officer recorded the license plate as 4YFY032.

At about 10:05 p.m. on October 4, 2021, Officer Dennis Mally was dispatched to Manor Boulevard and Inverness Street, less than a block from Ryan's Pub. Mally found two men on the ground, another man stumbling on his feet and another walking around on the sidewalk. The officer spoke with Ortega, who said he and his friends had been walking on the sidewalk on Inverness Street when a vehicle rounded the corner from Manor Boulevard and sped toward them. The vehicle struck them "very hard," hitting Ortega only on the arm but sending the other three airborne. Ortega described the vehicle as a blue utility vehicle similar to a GMC Yukon. He said that there had been a verbal altercation with a woman in the bar, and that as he and his friends were walking out of the bar, he heard the vehicle's engine revving and saw it speeding up and slowing down in the parking lot. One of the other victims was unconscious and the others were "pretty dazed." Mally saw pieces of what appeared to be a broken headlight on the street where the collision had taken place.

Sergeant Daren Pasut saw a vehicle matching the description of the one involved in the hit-and-run traveling northbound on Interstate 880 and positioned his patrol vehicle behind it, called for back up and followed as it

---

[3] There was testimony that these two vehicles are "basically the same."

3

exited the freeway.  After making a U-turn, the vehicle accelerated and Pasut activated his overhead lights and siren.  The vehicle accelerated and entered the freeway at about 90 miles per hour.  As Pasut continued to pursue it, the vehicle took the next exit, failed to negotiate the off ramp's hard right turn, and "went up and over the shoulder," entering the onramp to northbound 880 traveling in the opposite lanes of traffic.  Observing the vehicle almost collide into two other vehicles and continue in the opposite lanes of traffic, Pasut shut down his emergency equipment, parked, sent out a description and the direction of flight and advised that he was no longer in pursuit.

The vehicle was found by the Oakland Police Department and towed to San Leandro.  The recovered car had the same license plate—4YFY032—as the one recorded in the incident Bacon described from earlier on October 4.  It had damage to the front passenger side, which was the side that struck the hit-and-run victims, and the damage matched the broken pieces of headlight at the scene.

## II.

### *Procedural Background*

A first amended information filed on September 26, 2022, charged Moran with four counts of attempted murder (§§ 187, subd. (a), 664) (count 1, Michael Coelho; count 2, Alex Hernandez; count 3, Daniel Humburg; count 4, Matthew Ortega); four counts of assault (§ 245, subd. (a)) (count 5, Michael Coelho; count 6, Alex Hernandez; count 7, Daniel Humburg; count 8, Matthew Ortega) and one count of evading an officer and driving against traffic (Veh. Code, § 2800.4) (count 9).  The offenses in counts 1 through 8 were alleged to be violent felonies within the meaning of sections 667.5, subdivision (c), and 1170, subdivision (h)(3); counts 1, 2, 3, 5, 6 and 7 each alleged an enhancement for infliction of great bodily injury (§ 12022.7,

4

subd. (a)); and counts 5 though 8 alleged use of a deadly weapon (§§ 969f, 1192.7, subd. (c)(31)). The information further alleged aggravating factors under California Rules of Court,[4] rule 4.421(a)(1) and (b)(1)-(5), as to all counts; and, for counts 1 through 8, also under rule 4.421(a)(2).[5] The information also alleged four prior convictions, two of which were for strike offenses.

Moran entered pleas of not guilty and denied all allegations, and a jury trial began. Several days into the trial, on October 4, 2022, Moran expressed interest in a 10-year plea that the prosecution had offered earlier in the case, but the prosecutor responded that no offer would be extended at this point. The court indicated it would offer Moran a "plea to the sheet," which it told Moran was "essentially an admission of all counts, all clauses, and all priors." The court explained:

"I would strike the strike priors under a case called *Romero*.[6] By doing so, I can take an L off the table. · All right. · But in return for you

---

[4] All further references to rules are to the California Rules of Court.

[5] These aggravating factors alleged that the crimes involved great violence, great bodily harm, threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness or callousness (rule 4.421(a)(1)), the defendant was armed with or used a weapon (rule 4.421(a)(2)), the defendant engaged in violent conduct indicating a serious danger to society (rule 4.421(b)(1)), the defendant's prior convictions were numerous or of increasing seriousness (rule 4.421(b)(2)), the defendant served a prior prison term (rule 4.421(b)(3)), the defendant was on probation, mandatory supervision, postrelease community supervision or parole when the crime was committed (rule 4.421(b)(4)), and the defendant's prior performance on probation, mandatory supervision, postrelease community supervision or parole was unsatisfactory (rule 4.421(b)(5)).

[6] *People v. Superior Court (Romero)* (1996) 11 Cal.4th 497 (*Romero*).

pleading to the sheet, my offer to you would be, or I would sentence you as follows:

"On the first count, I would sentence you to the aggravated term of 9 years plus 3 years for the great bodily injury. I'm basing that on your admission of what will be the circumstances in aggravation under the rules of court. I'm basing that on your significant criminal history. I am basing that on the evading that was involved in the case, sounds like not once but twice. I am about as least a fan of evading as anybody wearing a black robe is in Alameda County and I wasn't too hip on that F-the-police comment. So I would sentence you to the aggravated term plus GBI [great bodily injury] for 12 years.

"I would then sentence you to the second count of attempted murder to one-third the midterm. That's 2 years 4 months, plus 3 years for the GBI for a total of 5 years 4 months in addition [to] that 12.

"I'd do the same thing on Count 3. Count 3 is the 2 years 4 months plus 3 for 5 and 4.

"I wouldn't sentence you on the fourth count of the attempted murder.

"I would sentence you in that instance to the [section] 245[, subdivision] (a)(1). That's where I'm kind of cutting you some slack here, and on that I would sentence you to one-third the midterm which is only a year.

"I'd run everything else—I'd either find everything else to be [section] 654, meaning they're the same essential activity, and anything I'd give you for the evading I would run concurrent, meaning the time would go the same, at the same time so there wouldn't be any additional time.

"But the total prison commitment that we're looking at, if you were to accept or if you were to plead to the sheet today, would be 23 years 8 months at 85 percent, which I know is not an insignificant amount of time, but in all

6

candor that gives you the opportunity to walk out of prison—well, it gives you the opportunity to walk out of there instead of being taken out of there in a pine box. That's pretty much where I'm coming from. Okay. I wouldn't put an L on it. If this goes adverse to you, that's a different story. Okay.

"So where are we at? I've got 14 people back there waiting to hear from the rest of the witness [*sic*] who are coming in."

Moran asked when he would "have to sign" and the court told him "today," and asked if he wanted to talk to his attorney. Moran asked, "[s]o the nine time, would that be premeditated," and the court replied, "No, it's not as it's alleged"; Moran said he had read in the Penal Code "that a [section] 664 you do half time" and the court told him, "No. This is 85 percent. These are serious and violent." Asking again if Moran wanted to talk with defense counsel, the court told him, "I know it's a lot to bite off, but the bottom line is what is the Court is offering you is something that doesn't have a life exposure, whereas if the jury returns a verdict of guilty, we don't have that option so I am giving you that." The court recessed for Moran and defense counsel to talk. When they returned, trial continued.

After several more prosecution witnesses testified, the court excused the jury and told the parties it understood Moran was prepared to "plead to the sheet for the Court's indicated sentence of 23 years, eight months." Defense counsel confirmed this; the court directed counsel and Moran to discuss and fill out the plea and waiver form; and the prosecutor confirmed that the People were "conveying no offers." Upon receiving the completed form, the court stated that it corresponded to the court's "earlier comments or offer of Mr. Moran to plead to the sheet in return for a total prison commitment of 23 years 8 months." Counsel relayed Moran's request for a night to "sleep on this deal" and discuss it with his mother and sister, who

were in the courtroom. The court responded, "I can appreciate him asking for that but I have to deny that. We either go on this now or I'll just bring the jury back tomorrow and we can pick up where we left off because we've got business to take care of today."

In response to questions from the court, defense counsel confirmed his understanding that "the Court indicated a sentence of 23 years and 8 months" as "the proposed disposition on the plea to the sheet" and Moran confirmed his "understanding of the proposed disposition or resolution" as "a plea to all counts, all clauses, and all priors, understanding I'm going to *Romero* or strike, get rid of the strike priors." Defense counsel confirmed that he had discussed the case and "all the possible defenses" with Moran and explained to him all the rights listed on the plea form, and that counsel consented to the disposition. Moran confirmed that no one had made him any promises "other than the ones we just made here in open court" or threatened or forced him to plead no contest; he was not under the influence of alcohol, drugs or medication; he understood all the rights listed on the plea form and he intended to enter the agreement and "freely and voluntarily give up those rights so that [he could] enter into this agreement." The court explained Moran's trial rights and Moran confirmed that he understood and gave them up. After the court reiterated that "under the terms of this deal, as you know, probation is going to be denied and you're going to be sentenced to an aggregate term of 23 years and 8 months in state prison," Moran confirmed that he understood and accepted "all the terms and conditions of this plea." He also confirmed that he understood he normally would have a right to appeal his conviction but was giving up this right by entering the plea.

Moran entered pleas of no contest to all counts and admitted all the enhancement allegations and aggravating factors, except that he was not asked about and so did not admit any of the on-bail allegations and the rule 4.421(b)(1) aggravating factor as to count 1.[7] He admitted each of the alleged prior convictions. The court accepted Moran's pleas and admissions and found the prior convictions true.[8]

On January 12, 2023, Moran filed a motion to withdraw his pleas. He argued that he was coerced and intimidated into accepting the court's offer and pleading no contest by the court's comment that a benefit of pleading guilty would be "the opportunity to walk out of [prison] instead of being taken out of there in a pine box." Moran declared that the court's comment caused him to focus on his fear of dying in prison rather than on what course of action would be best for him. He also claimed that he was under the influence of heroin at the time he entered his plea and could not sufficiently comprehend the court's or his attorney's admonitions.

At a hearing on January 13, 2023, the court denied the motion on the basis of its observations of Moran on the day he entered the plea agreement

[7] The People acknowledge that Moran did not admit the on-bail allegations or the rule 4.421(b)(1) aggravating circumstance on count 1. The court's failure to ask Moran whether he admitted these allegations appears to have been an oversight. The record indicates that the court thought it had covered all the charges and allegations in the first amended information, as it said it was accepting his "admissions of the circumstances in aggravation pursuant to all those Rules of Court attached to all these counts," and the court's minutes state, "The defendant admits all Special Allegations and Prior Convictions charged in the First Amended Information."

[8] The court found that Moran understood the nature of the crimes charged, the penalties and the consequences of a conviction; that he had been fully informed of his rights and waived them knowingly, freely, voluntarily, and intelligently; and that, based on the stipulation of both counsel, there was a factual basis for the pleas.

and the circumstances surrounding his decision to do so. After explaining its decision at length,[9] the court sentenced Moran to the aggravated term of nine years on count 1, attempted murder, plus a consecutive three years for the great bodily injury enhancement; consecutive one-third middle terms of two years four months for counts 2 and 3, attempted murder, plus consecutive three-year terms on each count for the great bodily injury enhancements; a consecutive one-year middle term on count 8, assault with a deadly weapon; and a concurrent two-year middle term on count 9, evading an officer. The court stayed sentencing on counts 4 through 7 pursuant to section 654.

---

[9] The court found Moran's claim of not thinking clearly due to being under the influence of heroin "strain[ed]s credulity to the maximum" because he entered the plea at the end of a full court day during which he appeared "lucid" and "engaged in the proceedings" and the court observed no dozing or impairment of dexterity or gait; Moran did not indicate how much heroin he had ingested or when, where, or how he had done so and there had been a significant gap in time since he could have ingested any; he denied being under the influence of any drug, medication or alcohol; and the court was not informed of any medical or other problems. The court commented that Moran "had the wherewithal" to consult with his attorney and ask the court for an opportunity to discuss the potential plea with family members.

As to Moran's claim of coercion, the court noted that the plea discussion was preceded by multiple days of trial, with testimony from witnesses and presentation of videos; that defense counsel had suggested in opening statement that the issue in the case was who was driving the car but by the time of the plea "it was pretty darn clear" and even "beyond all possible doubt" that Moran was driving; that it was reasonable for the prosecutor not to extend an offer in light of the work put into the case; that the court's offer was conveyed to Moran at the lunch recess and he thought about it during the afternoon; and that when the discussion resumed at the end of the day, the court tried to convey the serious stakes of continuing the trial but did not express a view as to what the jury would do or what Moran should do. The court concluded that Moran made his choice freely and of his own volition and nothing in the record suggested "the slightest indication" he was "acting under any sort of coercion or intimidation."

Moran filed a timely notice of appeal on February 6, 2023.  On May 23, 2023, he filed in this court a motion to amend the notice of appeal to include a request for a certificate of probable cause to enable him to challenge the denial of his motion to withdraw his plea.  We granted the motion on August 31, 2023, and the superior court denied the request for a certificate of probable cause October 4, 2023.[10]  Moran challenged the denial with a petition for writ of mandate, which this court denied on January 5, 2024.  (*Moran v. Superior Court,* A169209.)

## DISCUSSION

Moran argues that he is entitled to resentencing because the court imposed an unauthorized sentence.  He maintains the court offered an indicated sentence of 23 years 8 months without explaining how it arrived at that number, then at sentencing imposed full consecutive sentences on the enhancements for counts 2 and 3 in violation of section 1170.1, which directs that the sentence on enhancements applicable to consecutively sentenced subordinate counts be one-third of the term for the enhancement.[11]  Moran additionally argues the sentence proposed and imposed by the court "overrode" statutes concerning mitigating circumstances a trial court must consider in exercising its discretion as to which of the three specified terms to

---

[10]  A handwritten note next to the judge's signature states:  "Defendant changed plea only after learning that his girlfriend/co-[defendant] was arrested and was going to testify."

[11]  The pertinent provision of section 1170.1 provides, "The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed, and shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses."  (§ 1170.1, subd. (a).)

11

impose for an offense and whether to strike enhancements.  (§ 1170, subd. (b); § 1385, subd. (c).)

The People contend Moran is precluded from pursuing these challenges because he did not obtain a certificate of probable cause from the trial court as required by section 1237.5 and because he waived his right to appeal as part of his agreement.  Moran maintains a certificate of probable cause is not required because he is challenging only his sentence, not the plea.  As we will explain, we agree with the People that the sentence was an integral part of the plea.

"The right to appeal from a final judgment of conviction based on a plea of guilty or no contest is subject to certain limitations, including first obtaining a certificate of probable cause from the trial court.  (§§ 1237, subd. (a), 1237.5.)"  (*People v. Arriaga* (2014) 58 Cal.4th 950, 958.)  Section 1237.5 provides:  "No appeal shall be taken by the defendant from a judgment of conviction upon a plea of guilty or nolo contendere . . . except where both of the following are met: [¶] (a) The defendant has filed with the trial court a written statement, executed under oath or penalty of perjury showing reasonable constitutional, jurisdictional, or other grounds going to the legality of the proceedings. [¶] (b) The trial court has executed and filed a certificate of probable cause for such appeal with the clerk of the court."  "This requirement does not apply, however, if the appeal is based upon grounds that arose after entry of the plea and that do not affect the validity of the plea."  (*People v. French* (2008) 43 Cal.4th 36, 43.)  Section 1237.5 "lays down a 'condition precedent' to the taking of an appeal within its scope" and "should be applied in a strict manner."  (*People v. Mendez* (1999) 19 Cal.4th 1084, 1098.)

12

" 'It has long been established that issues going to the validity of a plea require compliance with section 1237.5.' " (*People v. Buttram* (2003) 30 Cal.4th 773, 781, quoting *People v. Panizzon* (1996) 13 Cal.4th 68, 76 (*Panizzon*.) " 'In determining whether section 1237.5 applies to a challenge of a sentence imposed after a plea of guilty or no contest, courts must look to the substance of the appeal: "the crucial issue is what the defendant is challenging, not the time or manner in which the challenge is made." [Citation.] Hence, the critical inquiry is whether a challenge to the sentence is *in substance* a challenge to the validity of the plea, thus rendering the appeal subject to the requirements of section 1237.5.' " (*Buttram,* at pp. 781-782, quoting *Panizzon*, at p. 76.) "[A] challenge to a negotiated sentence imposed as part of a plea bargain is properly viewed as a challenge to the validity of the plea itself. Therefore, it [is] incumbent upon [a] defendant to seek and obtain a probable cause certificate in order to attack the sentence on appeal." (*Panizzon,* at p. 79.)

In arguing his appeal does not challenge his plea, Moran claims the court offered, and he accepted, an "open plea" to an "indicated sentence" with the promise of a "lengthy non-life sentence," but that the precise term of the sentence was immaterial. Moran focuses on the fact that the plea was not negotiated with the prosecution but offered by the court as a "unilaterally fashioned," "take-it-or-leave-it" illegal sentence as to which Moran had no input. In his view, "the essence of the plea bargain was for a lawful determinate term" and the 23-year 8-month term imposed by the court was not "an integral element of [a] negotiated plea agreement" as described in *Panizzon, supra,* 13 Cal.4th at pages 85-86.

Typically, a plea bargain is negotiated between the defendant and the prosecutor, although the bargain is valid only once approved by the court.

(*People v. Clancey* (2013) 56 Cal.4th 562, 570.) Moran does not suggest a plea bargain cannot be made with the court rather than the prosecution, and the statutory definition of plea bargaining (§ 1192.7, subd. (b))[12] suggests it can, provided the prosecutor does not object. (*Clancey,* at p. 570 [" 'court has no authority . . . under the guise of "plea bargaining" to "agree" to a disposition of the case over prosecutorial objection' "]; *People v. Turner* (2004) 34 Cal.4th 406, 418 ["court entered into a plea bargain, which required the consent of the prosecutor"; "[b]ecause the prosecutor objected, the court exceeded its jurisdiction"].) Here, although the prosecutor declined to offer a midtrial plea agreement, she did not object to the disposition offered by the court and accepted by Moran.

In our view, Moran's characterization—that he entered an "open plea" to an "indicated sentence" and was guaranteed only that he would be sentenced to a determinate term rather than a life term—does not accurately describe the circumstances.[13] "An open plea is one under which the defendant is not offered any promises. (*People v. Williams* (1998) 17 Cal.4th

_____

[12] Section 1192.7, subdivision (b) provides that " 'plea bargaining' " means any bargaining, negotiation, or discussion between a criminal defendant, or their counsel, and a prosecuting attorney *or judge*, whereby the defendant agrees to plead guilty or nolo contendere, in exchange for any promises, commitments, concessions, assurances, or consideration by the prosecuting attorney *or judge* relating to any charge against the defendant or to the sentencing of the defendant." (Italics added.)

[13] We recognize that the trial court referred to its "indicated sentence" when it began the plea discussion by asking if it was correct in understanding that Moran wanted to "plead to the sheet for the [c]ourt's indicated sentence of 23 years, eight months" and after receiving Moran's plea form, referred to having "indicated a sentence of 23 years and 8 months" in asking defense counsel if this was his "understanding of the proposed disposition on the plea to the sheet." Our focus, however, is on the substance of the plea agreement.

148, 156.) In other words, the defendant 'plead[s] unconditionally, admitting all charges and exposing himself to the maximum possible sentence if the court later cho[oses] to impose it.' (*Liang v. Superior Court* (2002) 100 Cal.App.4th 1047, 1055-1056.)" (*People v. Cuevas* (2008) 44 Cal.4th 374, 381, fn. 4.) Although Moran admitted all charges, he did not expose himself to the maximum possible sentence: The court promised to strike the priors so as to avoid a life term, and to impose a specific term that included sentencing on the lesser count of assault in lieu of the count of attempted murder as to one of the victims. The court then imposed precisely the sentence it promised.[14]

Moran's emphasis on the trial court offering an indicated sentence is similarly problematic. "An indicated sentence is just that: an indication. Until sentence is actually imposed, no guarantee is being made." (*People v. Delgado* (1993) 16 Cal.App.4th 551, 555.) In an indicated sentence, the court

---

[14] *Liang v. Superior Court, supra,* 100 Cal.App.4th 1047, is informative, although the context differs from the present case. In *Liang,* three codefendants pled guilty in exchange for the trial court's offer of a lenient sentence that was conditioned on all three entering guilty pleas that day. (*Id.* at p. 1049.) The question was whether the trial court had authority to vacate Liang's plea over his objection after the codefendants succeeded in having their pleas set aside, which the trial court viewed as violating a condition of the plea bargain. The defendant argued he had not entered a plea bargain, only pled "open" to the court after admitting all charges. (*Id.* at p. 1050.) Rejecting this argument, *Liang* explained that although the defendant "technically argue[d] correctly" that "the offer did not involve dismissal of any charges, which could only be done by the prosecutor, not the court," he was "incorrect in arguing that his plea was open or unconditional. In fact, Liang's plea unequivocally was made to accept an indicated sentence far more lenient than his potential maximum, and thus was a sentence bargain. . . . [¶] Liang unequivocally entered his pleas in exchange for a lenient indicated sentence. He did not plead unconditionally, admitting all charges and exposing himself to the maximum possible sentence if the court later chose to impose it." (*Id.* at pp. 1055-1056.)

states " 'what sentence [it] will impose if a given set of facts is confirmed, irrespective of whether guilt is adjudicated at trial or admitted by plea.' " (*People v. Turner, supra,* 34 Cal.4th at p. 419.) "The court may, and should, withdraw from an 'indicated sentence' if new facts are brought out at the sentencing hearing showing that the 'indicated sentence' is not appropriate." (*People v. Superior Court (Ramos)* (1991) 235 Cal.App.3d 1261, 1269.) Here, the court promised not only a lengthy determinate sentence but a specific term of years, the components of which were explained to Moran. The sentence was *not* what the court anticipated imposing if Moran was found guilty at trial: The court expressly offered the sentence for the purpose of enabling Moran to avoid the life sentence to which he would be exposed if the trial resulted in conviction. No one expected a sentencing hearing at which facts might be presented in an effort to persuade the court to impose a different sentence. Contrary to Moran's assertion that the court did not explain how it calculated the 23-year 8-month sentence it offered, the components of the proposed sentence were laid out in the offer, including the three-year terms for the enhancements in counts 2 and 3. Thus, Moran's challenge to these components of the sentence is not based on "grounds that arose after entry of the plea and that do not affect the validity of the plea." (*People v. French, supra,* 43 Cal.4th at p. 43.)

Moran's focus on the absence of defense input into the length of the sentence and legality of its components indicates his argument is based on premises that a specific sentence cannot be an integral part of the bargain if there was not a give and take as to its length and components, and that his subjective motivation for agreeing to the sentence proposed is determinative as to the essence of the agreement and, consequently, whether a certificate of probable cause is required. No doubt the avoidance of exposure to a life term

was a critical component of the court's offer and Moran's acceptance. But the court's offer was for Moran to plead no contest in exchange for the stated term of 23 years 8 months as the alternative to exposure to a potential life sentence if convicted at trial. There was no suggestion the court would consider a different sentence either by negotiation or after considering additional evidence at a sentencing hearing. As the court observed when Moran later sought to withdraw his plea, the evidence the jury had received by the time Moran entered his plea suggested it was very likely he would be convicted.[15] Thus, Moran obtained a significant benefit by accepting the plea agreement: As the court noted at the time, the plea agreement would require him to serve the "not . . . insignificant" term of 23 years 8 months but would ensure he would not remain in prison for life. In short, the 23-year 8-month term was part and parcel of the offer Moran accepted and, therefore, an integral element of the plea bargain.[16]

We conclude that Moran's failure to obtain a certificate of probable cause precludes our review and the appeal must be dismissed.[17]

---

[15] The court observed that at the outset of trial, defense counsel told the jury that the issue was identity of the driver and, by the time Moran entered the plea, multiple witnesses had testified, the jury had seen multiple videos, and in the court's opinion it was "pretty darn clear" and even "beyond all possible doubt" that Moran was the driver.

[16] The People do not dispute that imposition of full terms for enhancements on subordinate counts violates the one-third term limitation prescribed by section 1170.1. Moran offers no authority indicating the certificate of probable cause requirement is inapplicable where the sentence agreed to as part of a plea bargain departs from a statutory restriction. Nor does he argue that an unlawful sentence imposed as part of a plea bargain necessarily invalidates the plea.

[17] This conclusion makes it unnecessary for us to consider the People's additional argument that the appeal is precluded by Moran's waiver of the right to appeal his conviction.

## DISPOSITION

The appeal is dismissed. The matter is remanded to the trial court with directions to modify the abstract of judgment to state the disposition on counts 4 through 7.[18]

---

[18] As Moran points out, the existing abstract of judgment does not indicate the disposition on counts 4 through 7, as to which the trial court stayed sentencing.

STEWART, P.J.


We concur.


RICHMAN, J.


MILLER, J.


*People v. Moran* (A167158)